I understand that everyone is here who will be arguing today and accordingly will dispense with the calling of the calendar. We'll hear the first case, Atlas Air v. International Brotherhood. Thank you, Your Honor. May it please the Court, my name is Ed Gleeson from the Law Office of Edward Gleeson. I represent the International Brotherhood of Teamsters as well as its local affiliate, Teamsters Local 1224. In this case, we are, of course, appealing the decision from Judge Forrest from the Court below, holding that, denying our motion, well, actually granting summary judgment to the company and converting what had been our motion to dismiss as a motion for summary judgment and denying that. So we're here on a de novo review. And this is a case where, as Judge Forrest noted, although the facts tend to be a bit complicated, the law shouldn't have been nearly as confused as I believe it turned out to be. I think that the Court made several errors, all of which are reversible. I'd like to discuss with you today a couple of those, given my rather short period of time with you. The first one I'd like to discuss is the statute of limitations argument. The statute of limitations argument applies particularly to the Atlas grievance, that's the Atlas Air Grievance. Unlike in Southern, there was no dispute that Atlas had a right contractually to file a management grievance. The problem there is, you know, at least that the contract allows for the filing of a management grievance. There is a problem that Atlas alone is not the company, and the right to file a management grievance is the company. The company is defined specifically in the collective agreement as both Atlas Air and Polar Air Cargo, collectively referred to as the company, and that's effectively quoting from the very beginning of the section one of the collective agreement. Atlas alone is not the company. But again, with respect to the statute of limitations, the company, in this case Atlas alone, filed a management grievance claiming that the union had to arbitrate whether or not section 1F to the collective agreement required us to engage in a contractual process to merge two separate contracts. The question is whether there's an unequivocal refusal. Is that a factual question? Is that a legal question? I think it's undisputed. It should be undisputed. I think that it's legal for the court to consider whether or not we've met the standard of an unequivocal refusal. I think that, indeed, we did. For example, there's some discussion about whether the subsequent negotiations impacted on this. What were those negotiations? What happened? Was this really unequivocal? It was unequivocally, Your Honor. The court made a mistake. I appreciate you saying that, but I'm trying to get a feel for whether this is a legal question, whether this is a factual question that requires discovery on whether the refusal was unequivocal. What are your thoughts on that? My thoughts are this is a legal issue. The way I read the case law, again, just starting alone just with Harrington, this court or the trial court can determine whether or not there was an unequivocal refusal. We started on our letter itself in saying that we will not arbitrate the April 20th. The employer argues that the language in the final paragraph of the letter, we look forward to an amicable resolution of our dispute, suggests that it wasn't really unequivocal, that there was a willingness to talk. How do you respond to that? My response is the court confused what the dispute was. The union has never deviated from its refusal to arbitrate the management grievance. The union has always, and I believe it is its responsibility, been amenable to trying to resolve disputes under the Railway Labor Act. And if you recall, under the record, the dispute here that we were referring to was the collective bargaining negotiations themselves, not the question as to whether we'd be willing to negotiate to arbitrate. We were not ever willing to arbitrate. That's clear. The company has recognized that as well. The court confused what the dispute in front of the court was. Wait a second. If you said we want to keep talking and negotiating, then that obviates the necessity of arbitrating, doesn't it? Well, the company – sorry. What would be the sense of arbitrating or litigating the arbitration matter if you were continuing to work towards negotiating a resolution of the dispute? That doesn't make any sense to me. Well, there's a distinction, again, between collective bargaining, which is what we have been doing, at least formally, since January. So if the union says let's keep talking and doesn't say anything about arbitrating, somehow the arbitrating clock continues to run? Well, the problem with that hypothetical, if you will, or question is that we did tell them repeatedly we will not arbitrate. We told them that not just in our April 20th letter. We told them in the May 10th meeting. We told them in subsequent letters in July and in August and in September. That's reflected in the record, those letters. You said that you didn't think it was arbitratable. We said we would not. The declaration of Captain Wells points that out, that if you will, we doubled down just in the May meeting alone. We will not arbitrate that dispute. We will be riveted into a chair ever before we would ever agree to interest arbitrate or to arbitrate those grievance or that grievance. We will not do that. And so I think it's very clear and it's very unequivocal. The question as to whether or not somehow our discussions or our negotiations to get back to the bargaining table somehow would hold. What about 177 where you said that an interest arbitration may be needed? The interest arbitration would refer to may be needed. That would be for a joint collective agreement if we agreed to a separate process, not the contractual one, but ones that we proposed to get back to the bargaining table. It was markedly different than 1F2 of the contract. It was a completely separate proposed process. Again, the issue as to whether or not just negotiations, even if it was on the merits, that does not, it's not the touchstone of what a clear and unequivocal refusal is. You know, the touchstone is did we refuse and did we do so unequivocally? And the answer to that is yes. And, again, I think the Richardson case here in this, within this circuit alone, points out that even if this was discussions and they weren't, but even if they were discussions or negotiations on the merits of that grievance, they alone, that merely does not toll or stop or not even allow for the accrual of the statute of limitations. We were clear and we were unequivocal. We were always willing to find alternatives to get back to the table and processes by which to complete our negotiations, but we were just as clear we would not arbitrate that grievance as later on. When the grievance was filed and settled, we weren't going to do that either for different reasons. We had, and the company knew this, we had done that just in July 14th, the proposal that we had made. We will not arbitrate under the contract and we will not arbitrate the grievances trying to put us under the contract. That was clear. In addition, and obviously when we did offer a tolling agreement there and the company refused it. The company had three months left on its statute of limitations to either negotiate a tolling agreement or to file a motion or a complaint seeking to compel, and it chose not to do that. Very quickly, I know I've reserved two minutes, but there was one other issue, and that is the southern grievance. The southern grievance is not arbitrable at all. As we discussed, Section 204 of the RLA, that's not a proper basis by which to invoke the management grievance or even to allow a management grievance under the southern contract. The company concedes in its grievance itself that it's moving pursuant only to the statute, not to the contract. It concedes that the contract doesn't allow for management grievances, and therefore, by that reason alone, it's not arbitrable. Your Honors, I'm down to just a few seconds, but I think I may have blown past it, so I would like to reserve my time if that's okay. Thank you. Thank you. Good morning, Your Honors. Robert Siegel for Atlas Air. Let me direct my first comments to the statute of limitations argument Mr. Gleeson just made. First of all, it's the sequence of events and what the parties were negotiating is directly clear from the documents that were admitted into the summary judgment proceedings, and they are unequivocal. This starts with a letter from the union on April 20th, 2016. It asserts that the grievance is not arbitrable. It doesn't say it will never arbitrate it. It's not arbitrable, and then it invites discussion, and it says expressly that we look forward to trying to resolve our dispute in a consensual manner. Now, the district court, Judge Forrest, found that the sequence of events which then occurred, and in Judge Forrest's words, it's clear that the union was actively negotiating the merits of the Atlas grievance, i.e., the means of negotiating a JCBA, and those negotiations lasted through January 2017. The facts are in the record from the documents that were exchanged. These were not face-to-face negotiations. They were exchange of proposals, and, in fact, the union, in its brief to Judge Forrest, admitted this, admitted this. The union stated expressly, and Judge Forrest noted it in her opinion, the union said we participated in several meetings to discuss a solution that would enable the parties to resume their collective bargaining negotiations. The documents that are in the record overwhelmingly support Judge Forrest's finding here. There was a series of exchanges. They were attached to Captain Jeff Carlson's declaration and noted in paragraphs 15 to 24 in the summary judgment record, but what happened was the first thing that happened was there was a single discussion on May 10, 2016. The union told the company it might consider engaging in the interest arbitration process that the company felt was required, but it was concerned about one issue. They called it the scope provision, and they didn't want that to be subject to interest arbitration. So the events I'm talking about were described in Captain Carlson's second declaration, and I believe his declaration is at Joint Appendix 78, and it's his second declaration. He attached all of the proposals, and the union doesn't dispute this. There was a May meeting, and the discussion was how we might proceed with interest arbitration under Section 1F and Section 1B3 of the collective bargaining agreement, and the concern the union expressed was they didn't want to submit one particular issue, scope. They explained they thought they wouldn't do well in interest arbitration. The company made a compromise proposal and offered then to exclude the scope issue from the interest arbitration. These were called compromise proposals, and obviously if these discussions had succeeded, there would have been no need to prosecute the management grievance or have an arbitration on it because we were trying to come up with an alternative procedure. On July 14, 2016, the union responded. They were not negotiating the collective bargaining agreement. They handed the company a document. It was called Proposed Letter of Agreement Regarding JCBA Negotiations Process. They were negotiating a compromise that, if it was successful, would have made the management grievance arbitration unnecessary. In doing so, on July 14, the union's proposal in writing said, essentially, let's hold off on processing the management grievance. They said there should be a preservation of rights on that issue. Their words, not ours, and they said this preservation of rights should include the fact that both parties shall agree to suspend, toll, defer their dispute relating to the management grievance. There's no ambiguity about this. We're not bargaining for the collective bargaining agreement terms. We're seeing whether or not it would be necessary to pursue the management grievance. The union didn't want us to, so they said let's toll it and let's have these discussions. That's what happened, and all of that was in the record. Judge Forrest correctly relied on it to find that there was a process that was going on for a nine-month period. This included an exchange of compromise proposals afterwards, August 12, September 2, September 30, through November, through December. Finally, on February 17, the company determined that the union compromise and the company compromise negotiations were not going to succeed, and so informed the union and filed the complaint that afternoon. That's what happened. That's what Judge Forrest found that happened, and it is indisputable, written record in the summary judgment process here. As the district court said, and I'm going to quote, Judge Forrest is right. It would have been nonsensical for Atlas, in the midst of those live negotiations, to file an action. Let's move on to the next part. Okay, thank you. The argument was that the southern grievance is not arbitrable. Right. There's two grounds for the southern grievance being completely arbitrable. First of all, Section 19D of the Southern Collective Bargaining Agreement states a broad statement of jurisdiction for this system board of adjustment at Southern. There's no ambiguity in that statement, and there's no limitation. The Section 19D, which Judge Forrest relied on, states that the adjustment board has jurisdiction, quote, over disputes growing out of the interpretation or application of any of the terms of the Southern CBA. That's a straight statement of jurisdiction under Section 19D of the CBA, and, of course, that is what we had here, a dispute over the meaning of Section 1B3 of the Southern CBA. It's plain on its face. If there were any doubt about it, the Section 19D statement of jurisdiction is derived from Section 204 of the Railway Labor Act. Section 204 of the Railway Labor Act expressly says that either party, the carrier or the union, may refer disputes to the appropriate adjustment board. It's a statutory right under 204 for a union or a carrier to be able to do so. Southern had a right to submit its grievance to the board, therefore, under contractual grounds, Section 19D, and also under statutory grounds. And there's been no waiver. There was absolutely no evidence of any waiver of that statutory right. As we said in our brief to this court, the Supreme Court has noted that if there's going to be any waiver of a statutory right, it must be clear and explicit. There is no allegation. There's no possible argument that the company waived its argument for that, for jurisdiction of the board. It's really plain and black and white. Judge Forrest got that right as well. I think that covers the points I'd like to make on that issue. Thank you. Thank you. We'll hear the rebuttal. Thank you, Your Honors. With respect to the southern grievance, again, the court is confusing what that language means. It's interpretation, an application of a collective bargaining agreement, that language from Section 19. I would point the court's attention to the Hawaiian Airlines versus Norris decision, Supreme Court decision, which is cited in the Care Flight case, which we rely upon in our papers. That language is synonymous with grievances. The language is that the board has jurisdiction over disputes growing out of grievances or out of the interpretation of application of any of the terms of the CBA. Why doesn't this cover the dispute over the meaning of sections of the CBA? Again, the Hawaiian Airlines versus Norris case talks about the part that says, or interpretation of disputes. That is synonymous with grievances. The company here, Southern, does not have a right to file a grievance under the collective agreement. At Care Flight, though, there was express limitation with regard to what could be grieved. Here we have This is very general language and doesn't limit either side, does it? It says disputes growing out of grievances or out of interpretation or application of any terms of this agreement. No limitation on Southern, no limitation as to who can bring the grievances. You're saying that this is not specific enough, but the case law seems to say if you're going to exclude somebody, it's got to be explicit. It's quite the contrary of what you're saying. Actually, the case law, actually, if you mention the Lehigh cement case. Well, was there not in Care Flight an express limitation as to who could bring the grievances? In Care Flight, that was a probate. Yes, that was Care Flight can't stand for the proposition that the language in this CBA somehow falls short with regard to the ability of Southern to raise a grievance, right? Your Honor, I think that it supports, it follows the Hawaiian Airlines plus AT&T Technologies. The whole concept of arbitration is one of consent. We have decades. We have contracts where they have never The adjustment board has jurisdiction over disputes growing out of grievances. Grievances? Yes. Limit whose grievances, the management's or labor's, or out of interpretation or application of terms of the agreement. No limitation on whose grievances. There are two sides to a contract generally, right, on a CBA? Section 19 talks about the grievance procedure. But I'm reading from Section 19. And Section 19, Your Honors, starts from A all the way through and talks about employee and union being those who file the grievances and the company, in this case Southern, having the ability to be the decider. It doesn't say that the company has a right to file a grievance. It does not. It concedes that because even in its own purported grievance to the union in this case, it didn't even rely on the contract. Thank you. Thank you. We'll reserve decision. Thank you, Your Honors.